STANTON L. KURZMAN vs. BERTON STEIR.

Middlesex.    June 9, 1981. — September 25, 1981.

Present: PERRETTA, ROSE, & DREBEN, JJ.

*Surety.   Guaranty.*

Where an officer of a corporation pledged his stock as collateral for a personal bank loan to the corporation's president and did so at the request of the corporation's board chairman who pledged his own stock as well, and where it appeared that the officer's pledge was not made for the benefit of the board chairman but to enhance the collateral in order to maintain an on-going relationship between the corporation and the bank, there were no circumstances which would warrant requiring the board chairman to reimburse the officer for those of the officer's shares which were ultimately sold, together with shares of the other sureties, to satisfy the loan deficiency, and it was immaterial whether the board chairman had pledged his own stock and become a surety before he requested the officer to do likewise. [472-475]

CIVIL ACTION commenced in the Superior Court Department on April 2, 1979.

The case was heard by *Dolan,* J., on a motion for summary judgment.

*Morris M. Goldings* for the plaintiff.

*Judith E. Schaeffer* of the District of Columbia *(John Nadas* with her) for the defendant.

PERRETTA, J.   The plaintiff, Kurzman, brought an action in the Superior Court alleging that the defendant, Steir, had been unjustly enriched at his expense by the manner in which the First National State Bank of New Jersey (Bank) had exercised its rights with respect to shares of stock in SCA Services, Inc. (SCA).   Kurzman, Steir, and one Thomas Viola had each pledged their stock as security for the Bank's loan to one Christopher Recklitis who subsequently defaulted on his obligation.   Although Kurzman had pledged a greater number of shares than Steir, Steir's shares were sufficent to

satisfy the loan deficiency. The Bank, however, proceeded against the pledged stock by selling the shares in proportion to the amount pledged by each of the sureties. Kurzman maintains that because he pledged his stock at Steir's request and subsequent to Steir's pledge, Steir would have had no right of contribution from him had the Bank proceeded solely against his, Steir's, stock. He reasons that since contribution could not have been demanded by Steir, the latter has been unjustly enriched. Kurzman seeks to have Steir turn over to him the same number of shares taken from him by the Bank or the value of those shares as of the date the Bank sold them. Steir's motion for summary judgment was allowed, Mass.R.Civ.P. 56, 365 Mass. 824 (1974), and we affirm the ensuing judgment.

We recite the facts surrounding the pledge transaction as they appear in the pleadings, affidavits, and a deposition given by Kurzman,[1] drawing inferences favorable to him where they are "predicated on the clear averment by [him] of subsidiary facts in his pleadings or affidavits." *Community Natl. Bank* v. *Dawes,* 369 Mass. 550, 559 n. 8 (1976).

Kurzman was a vice president and director of SCA, and Steir was chairman of the board. In 1973, Recklitis, the president of SCA, borrowed $1,100,000 from the Bank, pledging his own SCA stock as collateral. Thereafter SCA stock declined in value, and, in the spring of 1974, the Bank wanted more collateral for its loan. According to the complaint and deposition, Steir advised Kurzman of this fact in the following terms: "He told me . . . that Recklitis had difficulty with his loan with the [Bank], that SCA as a corporation kept money at the [Bank], that Viola was an officer and Director of the [B]ank as well as our Company

---

[1] Kurzman gave this deposition in a separate action which he brought against the Bank seeking to enjoin its sale of his stock and to compel it to satisfy the loan deficiency from stock pledged by the other sureties. He ultimately entered into an agreement with the Bank whereby it sold less than all his pledged shares and released him from any further obligation on the loan and on his pledge agreement. Kurzman, in turn, released the Bank from any and all claims he might have had against it in regard to the stock or the obligation which it secured.

which, of course, I knew, and with all of these factors involved, for good will, reputation and whatever, the [B]ank was looking for more collateral for Recklitis' loan." Kurzman also testified in his deposition that Steir told him that he and Viola "were going to come up with stock and that I was going to be asked, I was being asked to do the same." At the time of that conversation, to the best of Kurzman's knowledge, Steir and Viola had not yet pledged their stock on the Recklitis loan; rather, they were "just about ready to do it."[2]

Kurzman argues that it was error to enter summary judgment because a factual dispute exists as to whether Steir had pledged his stock and had become a surety on the Recklitis loan before he requested Kurzman to follow suit. This fact is material, continues Kurzman, because if it were found that he became a surety at Steir's request and after Steir had pledged his own stock, then Steir would be barred from seeking contribution from him. He concludes that, because of that bar, forced contribution by the Bank cannot stand as between Steir and himself, and he should be reimbursed by Steir. We do not agree that Kurzman's claim to restitution depends on the timing of Steir's request that he become a surety.

Kurzman's contention that the timing of Steir's request is critical is based upon a principle enunciated in the English case of *Turner* v. *Davies*, 2 Esp. 478 (1796), reprinted in 170 Eng. Rep. 425 (1927): "[W]here one has been induced so to become surety at the instance of the other, though he thereby renders himself liable to the person to whom the security is given, there is no pretence for saying that he shall be liable to be called upon by the person at whose request he entered into the security." This principle was repeated, as dictum, in *Taylor* v. *Savage*, 12 Mass. 98, 102 (1815): "It is settled, that, when a surety joins in the bond at the request

---

[2] Steir states in his affidavit that: "I told plaintiff that both Viola and I, for the good of the company, had agreed to pledge some of our own SCA stock to increase the collateralization of the Recklitis loan, and [I] suggested to plaintiff that he do the same. Plaintiff subsequently pledged some of his own shares of SCA common stock as additional collateral for the loan."

of him who sues for contribution, he shall not be held to pay." See also Restatement of Security § 147(2) (1941) ("Where a surety assumes his obligation at the request of another surety who is already bound, the former is a subsurety").[3]

Our understanding of this rule, however, is that its applicability does not turn on the sole basis of a request by a surety who is already bound. Cases and commentators alike discuss the rule and its availability in view of the totality of the circumstances existing among the parties at the time of the transaction, and a right to contribution has been found where a refusal to recognize it would be inequitable. See *Blake* v. *Cole*, 22 Pick. 97, 98, 101 (1839); *Hendrick* v. *Whittemore*, 105 Mass. 23, 25, 31 (1870); *Snelling* v. *State St. Bank & Trust Co.*, 358 Mass. 397, 401, 404 (1970). See also Chitty, Contracts 669, note g (10th Am. Ed. 1860); 1 Storey, Equity Jurisprudence § 498 (12th ed. 1877); 1 Brandt, Suretyship and Guaranty § 290 (3d ed. 1905); Restatement of Security § 146(b), and Comment b.

We see no factual or legal basis in the present instance for emphasizing the chronology of events at the expense of the totality of the circumstances surrounding the transaction which appears from the undisputed facts. These facts bespeak a common goal among the sureties, that is, to enhance the collateral on the Recklitis loan so that the relationship between SCA and the Bank would be maintained for the benefit of SCA. As stated in *Bagott* v. *Mullen*, 32 Ind. 332, 337 (1869): "If a surety making the request, receive any personal benefit from the execution of the obligation — as

---

[3] If Kurzman were deemed a subsurety, rather than a cosurety, on the loan, then Steir would have no right of contribution from him. See Restatement of Security § 145 ("Subsuretyship is the relation between two or more sureties who are bound to answer for the same duty of the principal [Recklitis] where one, the principal surety [Steir], in respect of the other, the subsurety [Kurzman], has the whole duty of performance"). Compare § 144 ("Cosuretyship is the relation between two or more sureties who are bound to answer for the same duty of the principal, and who as between themselves should share the loss caused by the default of the principal"). See also Simpson, Suretyship §§ 10, 12 (1950).

where the money raised thereon goes into his hands, or where he has already incurred a liability upon an instrument completed by delivery — we can see a propriety in the court treating the person thus benefited and making the request, as a principal, and the person signing at such request as his surety only and not liable to contribute for his benefit . . . But where parties standing in an equal relation to the principal sign as sureties for that principal, the one at the request of the other, we are not satisfied that any sound principle of law or equity will discharge either from the legal obligation he assumes on the face of the instrument to contribute his proportion on default of the chief obligor." That Steir may ultimately have pledged his stock before Kurzman did, or even before he asked Kurzman to do so, does not alter the purpose and the nature of the transaction as Steir described it to Kurzman.

Kurzman also argues that he is entitled to reimbursement from Steir because the latter made statements which were misleading in that they led him to the mistaken belief that the Bank would proceed against all of Steir's "prior pledged stock before his own." However, these statements, as set out in the margin,[4] provide no basis, as matter of law, for Kurzman's contention that Steir led him to believe that his (Steir's) stock would be exhausted before Kurzman's shares could be taken by the Bank. *Snelling* v. *State St. Bank & Trust Co.*, 358 Mass. at 404. See Restatement of Security § 147(1) and (2), and Comments a and b (1941). See also Restatement of Restitution § 9(1) and (2), and Comments a, b, and c (1937).

Moreover, we see nothing in the circumstances surrounding the transaction which makes contribution by Kurzman inequitable. See Restatement of Security § 146(b) (1941). Even if Steir and Recklitis in fact had a "special relationship" with

---

[4] Kurzman points to his "uncontradicted" allegations that Steir represented that the pledge was being sought only to maintain SCA's relationship with the Bank and that his (Kurzman's) pledge would never be called because Recklitis had other available collateral and because the SCA stock already pledged was going to "go up" in value.

each other which made Steir privy to Recklitis' financial affairs and business conduct, that does not, without more, mean that Steir should be required to bear the entire burden caused by Recklitis' default.[5] By his own statements, see note 1 *supra*, Kurzman acknowledged that he had some familiarity with Recklitis' financial affairs and that he had a business relationship with him, as well as with Steir and Viola, for a number of years. Kurzman was a director and stockholder in SCA, and he had a stake in the fortunes of the corporation. He understood that, although the loan was a personal one to Recklitis, the transaction could affect these fortunes by straining the relationship between the Bank and SCA.[6] We note further that by the terms on the face of the hypothecation agreement which Kurzman signed, he empowered the Bank to deal with his shares of SCA stock "in the same way and with the same force and effect" as those shares already pledged by Recklitis. While he signed this agreement in blank and at Steir's request, he does not claim that Steir misinformed him about the terms of the agreement or restricted him from inspecting it.

In conclusion, the undisputed facts show that there is no basis in law or in fact for requiring Steir to compensate Kurzman for the contribution forced upon him by the Bank. While he became a surety at Steir's request, he did not do so for Steir's benefit; nor do the equities of the situation entitle him to relief. Steir was properly granted summary judgment.

*Judgment affirmed.*

---

[5] Kurzman has not protected his right to contend that he should be given the opportunity to explore further this "special relationship." Mass. R.Civ.P. 56(f), 365 Mass. 825 (1974). See *First Natl. Bank* v. *Slade*, 379 Mass. 243, 244-245 (1979); *A. John Cohen Ins. Agency, Inc.* v. *Middlesex Ins. Co.*, 8 Mass. App. Ct. 178, 183-184 (1979).

[6] We reject Kurzman's contention that the fact that the loan was to Recklitis personally makes the "equally shared benefit among co-guarantors" factor relied upon in *Snelling* v. *State St. Bank & Trust Co.*, 358 Mass. at 404, of little application in the present instance.