516 S.E.2d 258

John D. LOWE, Jr., and Edward
E. Stout, Jr., Plaintiffs,

v.

Ralph D. ALBERTAZZIE and Carol
J. Albertazzie, Defendants.

No. 25445.

Supreme Court of Appeals of
West Virginia.

Submitted March 9, 1999.

Decided May 14, 1999.

Michael L. Scales, Greenberg & Scales, P.L.L.C., Martinsburg, West Virginia, Attorney for the Plaintiffs.

John W. Askintowicz, III, Law Office of John W. Askintowicz, III, Charles Town, West Virginia, John H. Kamlowsky, Frankovitch, Anetakis, Colantonio & Simon, Wheeling, West Virginia, Attorneys for the Defendants.

DAVIS, Justice:

The United States District Court for the Northern District of West Virginia presents this Court with a certified question asking whether West Virginia recognizes the principle of subsurety along with the equitable elements of that principle. We conclude that West Virginia does recognize subsuretyship. However, in accordance with that principle and the general principles of contract law, we find that the equitable elements of subsurety should be considered only in limited circumstances such as when an agreement between or among secondary obligors is ambiguous, when there is no agreement or when a party claims fraud, mistake, or material misrepresentations in the execution of the agreement.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The case underlying the question herein certified by the United States District Court for the Northern District of West Virginia [hereinafter "district court"] arises from bankruptcy proceedings involving Ralph D. and Carol J. Albertazzie [hereinafter collectively referred to as "the Albertazzies"], the appeal of which is now pending in the district

court. Three separate claims against the Albertazzies' bankruptcy estate are the subject of the appeal before the United States district court. The following factual history of the case *sub judice* results from a stipulation of facts entered into by the parties during proceedings before the United States Bankruptcy Court for the Northern District of West Virginia [hereinafter "bankruptcy court"].

Two related companies are involved in the underlying controversy, Flying A Communications, Inc. [hereinafter "Flying A, Inc."] and Flying A Communications Limited Partnership d/b/a WYVN–TV [hereinafter "Flying A Communications"]. Flying A, Inc., was the general partner of Flying A Communications. Ralph Albertazzie [hereinafter "Albertazzie"] was the president of Flying A, Inc. The stipulated facts do not indicate whether Albertazzie himself was a partner in Flying A Communications.

One of the three appealed claims against the bankruptcy estate of Ralph and Carol Albertazzie was asserted by Edward E. Stout, Jr. [hereinafter "Stout"], who was the Vice President of Flying A, Inc.[1] Stout was also a limited partner in Flying A Communications. On September 25, 1991, Flying A, Inc., borrowed $100,000 from One Valley Bank of Martinsburg [hereinafter "One Valley"]. The note and security agreement accompanying this loan list the borrower as Flying A, Inc., who signed the note through its President, Albertazzie. The note indicates that Albertazzie is the guarantor of the loan.[2] As security for this loan, Stout granted the bank a security interest in a certificate of deposit in the amount of $150,000, which had been issued to Stout in his own name and individual capacity.

In October, 1992, Flying A, Inc., filed a voluntary Chapter 11 bankruptcy petition.[3] Subsequently, the case was converted to a Chapter 7 bankruptcy action.[4] The stipulated facts state that One Valley satisfied Flying A, Inc.'s, $100,000 loan obligation by

enforcing its security interest in Stout's certificate of deposit. Thereafter, in March, 1993, and after the Albertazzies initiated their own bankruptcy proceedings, Stout filed Claim Number 20 against the Albertazzies' bankruptcy estate seeking to recover the $103,750 he was required to pay for satisfaction of Flying A, Inc.'s, $100,000 loan. The bankruptcy court denied Stout's claim insofar as he sought complete indemnification from the Albertazzies, and determined that Stout was "entitled to contribution from Albertazzie in the sum of one-half of the amount paid by Stout under his surety agreement." In rendering its decision, the bankruptcy court relied upon the language of W. Va.Code § 45–1–6 (1923) (Repl.Vol.1997), which explains "[c]ontribution among cosureties and coguarantors" as follows:

> If the principal debtor be insolvent, any surety or guarantor (or his [or her] committee, personal representative or heir) against whom a judgment or decree has been rendered on the contract in which he [or she] was surety or guarantor, may obtain a judgment or decree by motion, in the court in which such judgment or decree was rendered, against any cosurety or coguarantor (or his [or her] committee, personal representative or heir) for his [or her] share, in law or equity, of the amount for which the first-mentioned judgment or decree may have been rendered; and if the same has been paid, for such share of the amount so paid, with interest thereon from the time of such payment.

The court reasoned that although Stout signed as surety and Albertazzie signed as guarantor, their liability under the contract was identical because the terms "surety" and "guarantor" are often interchanged and because the only difference between the two terms pertains to procedures for suit and notice requirements to which the parties are entitled, rather than the extent or nature of their liability. Stout appealed this ruling to

---

1. This claim is designated Claim Number 20.

2. The parties represent that "Carol J. Albertazzie did not personally guarantee the obligation to the Bank."

3. Chapter 11 bankruptcy refers to reorganization. *See* 11 U.S.C. § 1101, *et seq.* (1994 ed.).

4. Chapter 7 bankruptcy refers to liquidation. *See* 11 U.S.C. § 701, *et seq.* (1994 ed.).

the district court which, as is noted in greater detail below, deferred ruling until this Court resolves the legal question presented herein.

The second and third claims being appealed in the district court both arose from a promissory note in the amount of $650,000 payable to One Valley that was executed by Flying A, Inc., on July 16, 1991. The promissory note provided that it "shall become effective only in the event that Letter of Credit # 84 issued in favor of Borrower is drawn upon by Dana Commercial Credit Corporation" [hereinafter "Dana"].[5] The note listed Flying A, Inc., as the borrower, which again signed the obligation by its President, Albertazzie. Under the note's guaranty section appeared the personal signatures of Albertazzie, Stout and John D. Lowe, Jr. [hereinafter "Lowe"].[6] In addition, the note was secured by a first deed of trust on real estate jointly owned by Stout and his wife, and Lowe and his wife.

Dana ultimately "drew upon" the letter of credit and, as with the $100,000 loan, Flying A, Inc., defaulted upon the $650,000 note. After Flying A, Inc.'s, default, the promissory note securing the letter of credit was paid by Stout and Lowe. Consequently, Stout and Lowe each filed claims[7] against the bankruptcy estate of the Albertazzies seeking reimbursement of the full $650,000 expended in satisfaction of Flying A, Inc.'s, promissory note debt.[8] For the same reasons it partially denied Stout's claim for $103,750, the bankruptcy court rejected, in part, Stout's and Lowe's claims for a $650,000 recovery from the Albertazzies, finding instead that "Albertazzie is liable [only] for his one-third share of the sum paid by Stout and Lowe on the note." The court observed that:

Claims Nos. [sic] 27 and 30 are even more evident as to the legal relationship of the

parties. On this note, Ralph Albertazzie, Edward E. Stout, Jr. and John D. Lowe, Jr. have all signed as guarantors. Although it is stipulated that the security was placed by Stout and Lowe, it is of no consequence. Assuming there had been no security, Stout and Lowe could have paid off the note to the bank and have demanded an equal contribution from Albertazzie.

Stout and Lowe appealed this ruling to the district court, which concluded that a determination of whether Stout and Lowe were entitled to the relief sought required clarification of the law of West Virginia by this Court. Accordingly, the district court deferred ruling and certified the following question for this Court's resolution:

Does West Virginia, by statute or common law, recognize the doctrine of subsurety, to the extent that the equities of the situation may require one of two sureties to be liable for the entire loss caused by the default of the principal, negating the usual pro rata indemnification of cosurety?

## II.

## STANDARD OF REVIEW

We recently held that "[a] de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998).

## III.

## DISCUSSION

The contention asserted by the plaintiffs, Stout and Lowe, is that they should be permitted to recover the full amount of the sums

---

5. According to a letter of commitment issued by One Valley in connection with the letter of credit, the letter of credit was established "for the account of Dana Commercial Credit Corporation who will be leasing to W[YV]N–TV the necessary equipment to initiate operations."

6. The stipulated facts do not reveal whether Lowe was an officer of either Flying A, Inc., or Flying A Communications or whether he had any prior association with either company.

7. These claims are designated Claim Number 30 (Stout) and Claim Number 27 (Lowe).

8. As with the $100,000 loan, the parties stipulated that "Carol Albertazzie did not execute any of the Agreements in question and is not liable for this obligation" arising from the $650,000 letter of credit and accompanying promissory note.

they paid to cure Flying A, Inc.'s, indebtedness to One Valley. They urge this Court to adopt the principle of subsuretyship wherein Stout and Lowe would be subsureties, with subordinate responsibility for Flying A, Inc.'s, indebtedness, and Albertazzie would be the primary surety who, as among the various sureties, is ultimately responsible for the satisfaction of Flying A, Inc.'s, financial obligations. Stout and Lowe maintain that the principle of subsuretyship is not contrary to either the statutory or the common law of this State.

First, Stout and Lowe suggest that W. Va.Code § 45–1–6, the statute relied upon by the bankruptcy court, is not activated with regard to their claims because it requires a judgment against the surety or guarantor seeking contribution [9] and One Valley did not obtain a judgment against Stout or Lowe. Stout further contends that W. Va.Code § 45–1–6 does not govern his claim for reimbursement of the $100,000 he expended on Flying A, Inc.'s, behalf because the statute contemplates multiple guarantors or sureties. As there existed only one guarantor (Albertazzie) and one surety (Stout) with respect to this loan, Lowe argues, § 45–1–6 does not apply.

In the alternative, Stout and Lowe contend that if § 45–1–6 does apply, the statutory language included therein contemplates the consideration of equitable principles under appropriate circumstances. Thus, they argue that "the Legislature intended to codify equitable principles which may amend the hard and fast rule of *pro tanto* contribution between sureties."

Stout and Lowe also assert that the common law of this State does not preclude their claims of subsuretyship. In this regard they suggest that the right to contribution is derived from equitable principles. Building upon this Court's decisions finding that disproportionate contribution among codebtors may, under some circumstances, be appropriate, the plaintiffs urge this Court to continue this equitable trend and to adopt the principle of subsuretyship whereby one cosurety would be primarily liable for the principal's debt and the remaining surety(ies) would be subsurety(ies) to the principal surety.[10]

By contrast, the Albertazzies claim that W. Va.Code § 45–1–6 governs this matter and clearly intimates that coguarantors or cosureties are equally responsible for the debt of their principal. The Albertazzies further reject the plaintiffs' contentions that § 45–1–6 does not apply simply because no judgment has been rendered against them with respect to these obligations. Rather, urge the Albertazzies, the primary intent of this code section is to emphasize the co-equal responsibility of coguarantors or cosureties for a debt of their principal. Accordingly, the Albertazzies contend that Albertazzie and Stout are equally liable for the $100,000 debt of Flying A, Inc., and that Albertazzie, Stout and Lowe share equal responsibility for the corporation's $650,000 obligation.

The Albertazzies further respond that the common law of this State does not support the recognition of the principle of subsurety-

---

9. See *supra* page 260 for text of W. Va.Code § 45–1–6 (1923) (Repl.Vol.1997).

10. Stout and Lowe also urge this Court to adopt the principle of subsuretyship based upon the equities of the instant proceeding. In this regard, they argue that the bankruptcy court failed to consider the relative positions of the parties involved, *i.e.*, the role of Albertazzie as President of Flying A, Inc., as compared with the role of Stout as the corporation's Vice President and the undisclosed role of Lowe in this venture. Defendant Albertazzie replies that plaintiffs Stout and Lowe have failed to present facts sufficient to allow this Court to find that the equities of this case require Albertazzie to pay the entire amount of the debts incurred by Flying A, Inc., *i.e.*, the $100,000 loan and the $650,000 promissory note, or to conclude that equity demands a complete absolution of the financial responsibility of Stout and Lowe for these transactions. Inasmuch as the facts upon which Stout and Lowe rely in support of this argument were not established in the record below, we decline to address their argument in this manner. *See State ex rel. Preissler v. Dostert*, 163 W.Va. 719, 727–28, 260 S.E.2d 279, 284–85 (1979) ("It is well-settled that a court of record speaks only through its record and anything not appearing on the record does not exist in law. *State ex rel. Browning v. Oakley*, [157] W.Va. [136], 199 S.E.2d 752 (1973); syl. pt. 3, *Hudgins v. Crowder & Freeman, Inc.*, 156 W.Va. 111, 191 S.E.2d 443 (1972); syl. pt. 4, *State ex rel. Mynes v. Kessel*, 152 W.Va. 37, 158 S.E.2d 896 (1968) and cases cited therein.").

ship.[11] In the absence of contrary evidence, "it is presumed that the parties to a Note contracted liability according to the legal effect of the instrument and according to the position of their signatures thereto." *Citing Elkins v. Tompkins*, 94 W.Va. 136, 117 S.E. 914 (1923). Because Albertazzie and Stout both assumed secondary responsibility for the $100,000 loan, and because there is no evidence to the contrary, each is equally responsible for this debt.

Likewise, with respect to the $650,000 promissory note obligation satisfied by Stout and Lowe, the Albertazzies represent that the note and accompanying documents, *i.e.*, commitment letter and agreement, list Albertazzie, Stout, and Lowe as coguarantors and do not indicate any intent that Stout and Lowe should have lesser responsibility for the repayment of the debt as compared to Albertazzie, himself.

■ Having set forth the arguments of the various parties, we now consider whether the doctrine of subsurety should be recognized in West Virginia. We begin by reviewing the principle itself, which is applicable, if at all, only when more than one person or entity serve as secondary obligors to the obligation of a principal obligor. The Restatement (Third) of Suretyship and Guaranty (1996) describes this principle as follows:

§ 59. Rights Between Secondary Obligors—Subsuretyship

If the relationship between two secondary obligors is that of subsuretyship, as between them the principal surety occupies the position of a principal obligor and the subsurety occupies the position of a secondary obligor. . . .

This principle is further explained in the comments to § 59. Comment a states in part:

each secondary obligor is liable to the obligee in accordance with the terms of its secondary obligation. When the relationship between the secondary obligors is that of subsuretyship, their relationship is such that the obligation of the principal surety to the obligee is the underlying obligation, while the obligation of the subsurety to the obligee is the secondary obligation. . . . Thus, as between them, the principal surety ought to bear the entire cost of performance. . . . This section applies the rules governing the rights and duties running between principal obligors and secondary obligors to principal sureties and subsureties to the extent that, as between themselves, they occupy such status.

(Citations omitted). In addition, comment c explains the principal surety's duty of reimbursement:

When a secondary obligor performs its secondary obligation, a principal obligor who is charged with notice of the secondary obligation . . . has a duty to reimburse the secondary obligor. . . . Under this section, when a subsurety performs its secondary obligation, the principal surety, who is in the position of a principal obligor, has the duty to reimburse the performing subsurety for the cost of its performance if the principal surety is charged with notice of the subsurety's secondary obligation.

(Citations omitted). Finally, comment e describes the subsurety's right of subrogation:

When a secondary obligor, by performing the secondary obligation, satisfied the underlying obligation, the secondary obligor is subrogated to the rights of the obligee with respect to the underlying obligation. . . . Thus, under this section, when the subsurety's performance of its secondary obligation satisfied the underlying obligation, the subsurety is subrogated to the

11. Although the Albertazzies acknowledge that the common law of this State recognizes the principle of subrogation where a surety has discharged the debt of its principal, they state that a surety's right to subrogation from his or her principle does not apply to the instant proceeding as Flying A, Inc., was primarily liable on the $100,000 loan and Albertazzie, by serving as guarantor, and Stout, by providing security for the loan, both assumed secondary responsibility for this obligation. Thus, the Albertazzies contend, Stout's provision of security for the loan renders him a surety. *Citing* Black's Law Dictionary (5th ed. abridged 1983) (defining "surety"). Therefore, because the terms "surety" and "guarantor" are widely held to be synonymous, *see* W. Va.Code § 46–1–201(40) (1996) (Supp. 1998) (indicating that term "'surety' includes guarantor"); bankruptcy court's order herein, and because both Albertazzie and Stout are secondarily liable for the repayment of the loan, they share equal responsibility for this debt.

obligee's rights with respect to the underlying obligation, including the obligee's rights against the principal surety.

(Citations omitted).

By way of explaining how to ascertain whether the relationship between multiple sureties is that of cosuretyship [12] or subsuretyship, the Restatement provides:

§ 53. Distinguishing Cosuretyship from Subsuretyship

(1) When there is more than one secondary obligor with respect to the same underlying obligation, the relationship among the secondary obligors is either that of subsuretyship or cosuretyship.

(2) The secondary obligors may, by agreement, establish whether their relationship is that of subsuretyship or cosuretyship. Such an agreement may be express or may be inferred from the circumstances. If two secondary obligors agree that, as between themselves, one (the "principal surety") rather than the other (the "subsurety") should perform or bear the cost of performance, the relationship is that of subsuretyship. If two secondary obligors agree that, as between themselves, each should perform part of its secondary obligation or bear part of the cost of performance, the relationship is that of cosuretyship.

(3) In the absence of agreement between or among them, secondary obligors for the same underlying obligation are cosureties unless a subsuretyship relationship is established by circumstances that demonstrate that, as between themselves, one secondary obligor (the "principal surety") rather than the other (the "subsurety") should perform or bear the cost of performance.

Restatement (Third) of Suretyship and Guaranty § 53 (1996).

■ As paragraphs two and three of § 53 make clear, the principle of subsuretyship may be invoked by agreement of the parties or, in the absence of an agreement establishing the nature of the relationship of the sureties, by virtue of the equitable circumstances surrounding the agreement. We find nothing in the law of West Virginia that prohibits parties from agreeing to establish a subsuretyship relationship. On the contrary, this Court long ago recognized that, under certain circumstances, sureties may limit their liability by express or implied agreement. *See* Syl. pt. 3, *Huffman v. Manley*, 83 W.Va. 503, 98 S.E. 613 (1919) ("One who signs as surety on such note may stipulate at the time of entering into the obligation that he [or she] will not be liable for contribution with other sureties who signed before him [or her]."); Syl. pt. 4, *id.* ("One who thus signs such a note, at the request of the principal debtor, to enable him [or her] to discount it, may, without the knowledge of the prior surety, and without any agreement or understanding with him [or her], stipulate with the principal debtor that he [or she] signs only as surety for the prior parties."); Syl. pt. 5, *id.* ("Such stipulation need not be in writing, and parol evidence is admissible to show an express contract to that effect, or such contract may be implied from facts and circumstances shown."). *Cf.* Syl. pt. 3, *Estate of Bayliss v. Lee*, 173 W.Va. 299, 315 S.E.2d 406 (1984) ("The rule of equal or *pro tanto* contribution is not absolute if it can be shown that the co-obligors have by agreement made a different allocation as to their liability *inter se* or one or more of the co-obligors have received a disproportionate benefit from the transaction, then disproportionate contribution may be allowed.").[13] However, Stout

---

**12.** The Restatement defines cosuretyship by stating:

(1) As between cosureties for the same underlying obligation, each cosurety is a principal obligor to the extent of its contributive share ..., and a secondary obligor as to the remainder of its duty pursuant to its secondary obligation.

(2) To the extent that, as between themselves, one cosurety is a secondary obligor and the other is a principal obligor, the former has

rights of contribution against the latter. The rights of contribution are the same as the rights of a secondary obligor against a principal obligor....

Restatement (Third) of Suretyship and Guaranty § 55 (1996) (citations omitted).

**13.** The burden of establishing that an agreement was other than for cosuretyship is on the party who asserts that he or she contracted to be bound differently than other sureties. *Cf.* Syl. pt. 2, *McKown v. Silver*, 99 W.Va. 78, 128 S.E. 134

and Lowe do not claim that there was such an agreement, either expressed or implied. It is the equitable application of subsuretyship that is advocated by them and addressed in the certified question herein presented.

Pursuant to the guidelines established by the Restatement, equitable application of subsuretyship arises *only where there is no express or implied agreement by the parties setting forth the nature of their relationship.* Restatement (Third) of Suretyship and Guaranty § 53(3). *See also Kurzman v. Steir,* 12 Mass.App.Ct. 470, 426 N.E.2d 165 (1981) (finding no subsuretyship due, in part, to the fact that terms of hypothecation agreement indicated cosuretyship and plaintiff/appellant did not claim fraud or other misconduct by other surety).

■■■ This restricted application of the equitable element of subsuretyship is in accordance with the generally recognized principle of contract law establishing that a clear and unambiguous contract must be applied without reference to extrinsic evidence. *See* Syl. pt. 3, *First Nat'l Bank of Bluefield v. Clark,* 181 W.Va. 494, 383 S.E.2d 298 (1989) (" ' "When a written contract upon its face is couched in such terms as to import a legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties and the extent of the undertaking were reduced to writing. Parol evidence will not be admitted to vary its terms." Syllabus point 1, *Jones v. Kessler,* 98 W.Va. 1, 126 S.E. 344 (1925).' Syllabus Point 1, *W.L. Thaxton Constr. Co. v. O.K. Constr. Co.,* 170 W.Va. 657, 295 S.E.2d 822 (1982)."), *overruled on other grounds by* Syl. pt. 1, *Coonrod v. Clark,* 189 W.Va. 669, 434 S.E.2d 29 (1993). *See also* Syl. pt. 5, *Van-Kirk v. Green Constr. Co.,* 195 W.Va. 714, 466 S.E.2d 782 (1995) (" 'A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced accord-

ing to such intent.' Syl. pt. 1, *Cotiga Development Co. v. United Fuel Gas Co.,* 147 W.Va. 484, 128 S.E.2d 626 (1962)."); Syl. pt. 2, *Bennett v. Dove,* 166 W.Va. 772, 277 S.E.2d 617 (1981) (" 'It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.' *Cotiga Development Co. v. United Fuel Gas Co.,* 147 W.Va. 484, 128 S.E.2d 626 (1962), Syllabus Point 3."). Thus, where an agreement or contract including multiple sureties adequately and clearly sets forth the nature of their relationship to each other, then a court will not change the terms of the agreement, and resort to the laws of equity may not be had even where the contract terms appear harsh. *Continental Coal Co. v. Connellsville By-Product Coal Co.,* 104 W.Va. 44, 56, 138 S.E. 737, 742 (1927) ("Where the meaning of a contract is clear, a court will not change its terms, in order to relieve a party thereto because the contract is harsh and unreasonable. 'Nor will the dictates of equity be followed if by doing so the terms of a contract are ignored, for the folly or wisdom of a contract is not for the court to pass upon.' 13 C.J. p. 542, Sec. 513.").

■■■ One exception to this rule, however, arises where the contract was executed due to fraud, mistake or material misrepresentations. Where allegations of fraud, mistake or material misrepresentations are made, extrinsic evidence may be allowed. *See* Syl. pt. 1, *Warner v. Haught, Inc.,* 174 W.Va. 722, 329 S.E.2d 88 (1985) (" 'A written contract merges all negotiations and representations which occurred before its execution, and in the absence of fraud, mistake, or material misrepresentations extrinsic evidence cannot be used to alter or interpret language in a written contract which is otherwise plain and unambiguous on its face.' Syl. pt. 3, *Iafolla v. Douglas Pocahontas Coal Corporation,* 162 W.Va. 489, 250 S.E.2d 128 (1978).").

Having defined subsuretyship and set forth the threshold standard for determining

(1925) ("Where one of several joint endorsers, contrary to the legal effect of his [or her] endorsement, asserts that his [or her] contract with his [or her] co-endorsers was that he [or she] was to be bound differently from the legal import of

his [or her] endorsement, the burden is upon him [or her] to establish such fact by a preponderance of the evidence, without which he [or she] should not prevail.").

its applicability, we now look to other jurisdictions for guidance as to whether we should adopt this principle. First, we note that few courts have had occasion to address issues of subsuretyship. *See Cook v. Crabtree,* 733 S.W.2d 67, 69 (Tenn.1987) (observing that "there is not a large body of case law in our sister states involving subsurety issues"). In fact, we have found only nine states whose appellate courts have in some way addressed the issue of subsuretyship over the last fifty-four years. *See Swanson v. Krenik,* 868 P.2d 297 (Alaska 1994); *Western Coach Corp. v. Roscoe,* 133 Ariz. 147, 650 P.2d 449 (1982); *Kurzman v. Steir,* 12 Mass.App.Ct. 470, 426 N.E.2d 165 (1981); *St. Paul Ins. Cos. v. Fireman's Fund Am. Ins. Cos.,* 309 Minn. 505, 245 N.W.2d 209 (1976); *A & P Sheet Metal Co., Inc. v. Edward Hansen, Inc.,* 140 N.J.Super. 566, 357 A.2d 37 (1976); *American Ins. Co. v. Bureau of Workers' Comp.,* 84 Ohio App.3d 288, 616 N.E.2d 979 (1992); *King v. Finnell,* 603 P.2d 754 (Okla.1979); *Cook v. Crabtree,* 733 S.W.2d 67 (Tenn.1987); *Franco v. Peoples Nat'l Bank of Washington,* 39 Wash.App. 381, 693 P.2d 200 (1984).

None of the above cited cases provide an in-depth consideration of subsuretyship or glean reasons for its adoption. Similarly, in none of these cases did the court expressly adopt the principle. Rather, the courts simply considered, based upon the facts before them, whether or not subsuretyship applied. Contrariwise, the case *sub judice* is before this Court in the form of a certified question. Consequently, it is not for us to consider the factual circumstances to determine whether or not the parties have engaged in a subsurety relationship. That determination must be made by the district court. All that is before us is the legal question of whether West Virginia recognizes subsuretyship. To this end, we find it noteworthy that not one of the above-cited cases from our sister states rejected the concept of subsuretyship.[14] For this reason, and because the principle appears to be in accordance with general principles of contract law and provides additional means for determining the true meaning of ambiguous contracts, we hold that the principle of subsurety, which declares that if the relationship between two secondary obligors is that of subsuretyship, then as between them the principal surety occupies the position of a principal obligor and the subsurety occupies the position of a secondary obligor, is recognized in West Virginia.[15] In this regard, we further hold that when there is more than one secondary obligor with respect to the same underlying obligation of a principal obligor, the secondary obligors may, by agreement, es-

---

**14.** However, in a couple of cases the principle was not applied due to the inadequacy of the facts before the court. *See Western Coach Corp. v. Roscoe,* 133 Ariz. 147, 650 P.2d 449 (1982); *King v. Finnell,* 603 P.2d 754 (Okla.1979).

**15.** While the Albertazzies urge us to conclude that W. Va.Code § 45–1–6 governs this matter and clearly intimates that coguarantors or cosureties are equally responsible for the debt of their principal, we find that the terms of that code section preclude its application to the present circumstances. Pursuant to W. Va.Code § 45–1–6

If the principal debtor be insolvent, any surety or guarantor (or his [or her] committee, personal representative or heir) *against whom a judgment or decree has been rendered* on the contract in which he [or she] was surety or guarantor, may obtain a judgment or decree by motion, in the court in which such judgment or decree was rendered, against any cosurety or coguarantor (or his [or her] committee, personal representative or heir) for his [or her] share, in law or equity, of the amount for which the first-mentioned judgment or decree may have been rendered; and if the same has been paid, for such share of the amount so

paid, with interest thereon from the time of such payment.

(Emphasis added). The Albertazzies assert that this statute should apply even though no judgment has been rendered against Stout and Lowe, as the primary intent of this code section is to emphasize the co-equal responsibility of coguarantors or cosureties for a debt of their principal. To adopt the Albertazzies' position would require us to ignore the emphasized language of this code section, which mandates that a judgment or decree be entered against Lowe or Stout. Such an interpretation goes against established principles of statutory construction. *See* Syl. pt. 4, *State ex rel. Hechler v. Christian Action Network,* 201 W.Va. 71, 491 S.E.2d 618 (1997) (" ' "In ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation." Syl. Pt. 2, *Smith v. State Workmen's Compensation Commissioner,* 159 W.Va. 108, 219 S.E.2d 361 (1975).' Syl. pt. 3, *State ex rel. Fetters v. Hott,* 173 W.Va. 502, 318 S.E.2d 446 (1984)."); Syl. pt. 5, *Hosaflook v. Consolidation Coal Co.,* 201 W.Va. 325, 497 S.E.2d 174 (1997) (" ' ' "Generally the words of a statute are to be given their ordinary and famil-

tablish whether their relationship is that of subsuretyship or cosuretyship. Such an agreement may be express or may be inferred from the circumstances. If two secondary obligors agree that, as between themselves, one (the "principal surety") rather than the other (the "subsurety") should perform or bear the cost of performance, the relationship is that of subsuretyship. If two secondary obligors agree that, as between themselves, each should perform part of its secondary obligation or bear part of the cost of performance, the relationship is that of cosuretyship. Finally, we hold that extrinsic evidence may be admitted to establish equitable circumstances demonstrating that, as between themselves, one secondary obligor (the "principal surety") rather than the other (the "subsurety") should perform or bear the cost of performance of the principal obligation only where (1) an agreement between secondary obligors, which sets forth their status with respect to each other, is ambiguous; (2) a party claims fraud, mistake, or material misrepresentations in the execution of such agreement; or (3) there is no agreement between the secondary obligors.[16]

### IV.

### CONCLUSION

For the foregoing reasons, we conclude that West Virginia does recognize subsuretyship. However, in accordance with that principle, and the general principles of contract law, we find that the equitable elements of subsurety should be considered only in limited circumstances such as when an agreement between or among secondary obligors is ambiguous, when there is no agreement or when a party claims fraud, mistake, or material misrepresentations in the execution of the agreement.

Certified question answered.

---

iar significance and meaning, and regard is to be had for their general and proper use." Syl. Pt. 4, *State v. General Daniel Morgan Post No. 548, V.F.W.,* 144 W.Va. 137, 107 S.E.2d 353 (1959).' Syl. pt. 3, *Byrd v. Board of Education of Mercer Co.,* 196 W.Va. 1, 467 S.E.2d 142 (1995)."); *Keatley v. Mercer County Bd. of Educ.,* 200 W.Va. 487, 495, 490 S.E.2d 306, 314 (1997) ("It has been a traditional rule of statutory construction that 'the Legislature is presumed to intend that every word used in a statute has a specific purpose and meaning,' *State ex rel. Johnson v. Robinson,* 162 W.Va. 579, 582, 251 S.E.2d 505, 508 (1979)."); *Appalachian Power Co. v. State Tax Dep't of West Virginia,* 195 W.Va. 573, 586, 466 S.E.2d 424, 437 (1995) (" ' "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." ' *Martin v. Randolph County Board of Education,* 195 W.Va. 297, 312, 465 S.E.2d 399, 414 (1995), *quoting Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391, 397 (1992).").

**16.** While it is not for this Court to determine whether the factual circumstances of this case warrant resort to the equitable elements of subsurety, we note that the bankruptcy court appears to have resolved the issue by finding that the parties contracted to be cosureties. As to the $100,000 loan, the bankruptcy court concluded that although Stout signed as surety and Albertazzie signed as guarantor, their liability under the contract was identical because the terms "surety" and "guarantor" are often interchanged and the only difference between the two terms pertains to procedures for suit and notice requirements. As to the $650,000 promissory note, the bankruptcy court observed that the parties' legal relationship was even more evident because they all signed as guarantors of the note, thus making their obligations under the contract equal.